# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN SMITH, <br>    Plaintiff, <br>  vs. <br> BENTLEY UNIVERSITY, <br>    Defendant. | Case No.: <br><br> JURY DEMAND |

## VERIFIED COMPLAINT

John Smith[1] brings this Compliant against Bentley University for injunctive relief and damages because of procedural and substantive irregularities arising from a Bentley University student conduct hearing that resulted in John's expulsion from the university three weeks before his scheduled graduation.

## PARTIES AND PROTAGONISTS

1. Plaintiff John Smith ("John") is a Rhode Island domiciliary. Until his recent expulsion, he was a senior at Bentley University and a member of a sports team (the "Team") at the University.

2. Defendant Bentley University ("Bentley") is a Massachusetts non-profit corporation with a principal place of operation located in Waltham, Massachusetts.

3. Student A[2] is a student at Bentley University and a member of the Team.

4. Student B is a student at Bentley University and a member of the Team.

5. Student C is a student at Bentley University and a member of the Team.

6. Student D is a student at Bentley University and a member of the Team.

7. Student E is a student at Bentley University and a member of the Team.

---

[1] John Smith is a pseudonym. A motion to proceed under a pseudonym is filed herewith. Plaintiff is serving an affidavit containing the identities of the plaintiff and other individuals identified by pseudonym together with this complaint.

[2] Nonparty students are not identified by their actual names to protect their privacy.

8. Student F is a student at Bentley University and a member of the Team.

9. Student G is a student at Bentley University and a member of the Team.

10. Student H is a student at Bentley University and a member of the Team.

## JURISDICTION & VENUE

11. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because John and Bentley are citizens of different states and the amount in controversy exceeds $75,000.00.

12. This Court has personal jurisdiction over Bentley on the grounds that it is a Massachusetts corporation.

13. Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

14. During high school, John was an all-state athlete.

15. John is a first-generation college student, a person of color, the child of an immigrant parent, and comes from an underrepresented community.

16. Bentley offered John an athletic scholarship to play on the Team as a member of the class of 2025.

17. John was recruited by other universities, but he accepted Bentley's offer with the goal of obtaining a quality education and a competitive advantage in seeking employment after graduation.

18. During the past four years, John devoted countless hours to developing his athletic skills so that he could make a positive contribution to the Team.

19. John was scheduled to graduate from Bentley in May 2025. His cumulative GPA through the fall of 2024 was 3.17. He made the Dean's List several times.

20. John has contributed to Bentley and its community in countless ways, including through involvement in Athletes in Action, a Christian Bible study group for student-athletes. He also

works for Bentley Athletics and is involved in the Bentley Investment Group. He is a coach and mentor for numerous children in his community.

21. Though John is a senior, he has one additional year of athletic eligibility because he was injured during sophomore year and sat out the season as a medical redshirt.

22. After graduation, John planned to attend Bryant University as an MBA student and play on its athletic team.

*Introduction to Eli*

23. A Venmo scheme to make money had circulated among Bentley students for years, particularly among student-athletes on sports teams. John heard during his freshman year that captains on the Team had participated and profited from the scheme. John also learned that Bentley athletes had been doing so since before he was a student there.

24. During November 2024, an individual using the moniker "Eli" added John to his Snapchat contacts.

25. In his posts, Eli suggested that John and others could make money through Venmo.

26. Unfamiliar with Venmo scams, John told some Team members about the posts and introduced some of them to Eli through FaceTime calls.

27. Though John introduced some Team members to Eli, John did not manage the transactions. Eli gave instructions directly to the participating Team members. A teammate of John's, Student A, also participated in alerting students to the opportunity. In one case, a Team member reached out to John about participating, rather than the other way around.

28. The first transaction involved Student A. John made a FaceTime call to Eli in Student A's presence. Eli told Student A that he would transfer funds to Student A's Venmo account. Student A was directed to transfer the funds to someone else who would withdraw the funds and distribute

them pursuant to Eli's preset instructions. The final distribution had to be through an app other than Venmo.

29. Eli told Student A that he had nothing to worry about and he would use a gift card to make the Venmo transfer to Student A's account. Student A agreed.

30. Subsequently, Eli transferred $1,750 to Student A's account through Venmo. Student A then transferred the $1,750 to another friend through Venmo. As instructed, the friend then returned the funds to Eli, who kept $1,050 and sent John $700. John transferred the $700 to Student A.

31. Student A gave John $50 for making the introduction to Eli.

32. Thereafter, Student A told Student B and Student C that he had made $700 through Venmo. They in turn expressed their desire to make some fast money in the same way.

33. Student A told Student B and Student C to come to his dorm separately. John initiated calls with Eli, and additional Venmo transactions ensued.

34. The Student B transaction went as follows. Student B sent $2,725 to a friend through Venmo. The friend returned the $2,725 to Student B through Venmo. Student B then sent the $2,725 to John through CashApp. John sent $2,075 to Eli and $650 to Student B through CashApp.

35. The Student C transaction went as follows. Student C sent $1,500 to Student D, who sent John $1,475. John sent $350 to Student A, $425 to Student C and $750 to Eli.

36. Student F asked John if he could do his Venmo account. John responded that he didn't have Venmo so he couldn't but that he knew someone who could help him.

37. John made a FaceTime call to Eli, who told Student F what to do. Student F sent $4,250 to Student E. Because Student E didn't have any other apps than Venmo, he sent the money to Student H. Student H sent the money to John via Cash App in separate payments over the span of

a week, which totaled $4,215. John kept $390 and sent $2,875 to Eli, $900 to Student F, and $50 to Student H.

38. The final transaction involved Student G, who asked John to connect him with Eli because he needed money. John made the FaceTime call and Eli gave Student G instructions. Student G sent his mother $1,475, who sent the money back to Student G. Student G then sent $1,475 to John. From the funds John made the following distributions: $600 to Student G; $75 to Student A; and $800 to Eli.

*Suspension*

39. Sometime in December 2024, Student D told John that his Venmo account was frozen because of the $1,475 he sent to John. John told Student D to talk to Student C because Student C initiated the transaction.

40. On February 27, 2025, Student E accused John of scamming his Venmo account for $4,250 and demanded repayment by morning or he would go to the police.

41. John responded that Student F initiated the transaction and ended up with more money than he did. Student E then claimed, incorrectly, that Student F didn't receive any money and that John received it all.

42. Student E ominously told John that he had a bright future, and he didn't want anything to happen to destroy it.

43. John did not threaten Student E. He did not give Student E the money that he demanded, and Student E went to the Bentley police the next day.

44. On February 28, 2025, John was summoned to the Bentley University Police for an interrogation regarding Eli's Venmo transactions.

45. On March 5, 2025, at 5:32:10 PM, John received an email from Associate Dean Curtis Dugar, notifying him of a mandatory meeting at 9:00 AM the following morning.

46.     At that meeting, the associate dean gave John an interim suspension notice ordering him to vacate campus no later than 10:00 AM that day.

47.     The interim suspension notice stated that John was under investigation by the University Police but did not describe why or describe what Bentley policies or laws John had allegedly violated. The stated basis for the interim suspension was "the gravity of [the] allegations" and the fact that John would "not have classes" until after spring break.

48.     After John was suspended, he gave Student E $4,250 and Student D $1,500 to reimburse them for the money Venmo claimed it was owed.

49.     Bentley did not suspend any of the other students who participated in Eli's transactions, all of whom were also scheduled to play for the Team during the upcoming athletic season, unlike John, who had opted to play on different athletic team during the following season.

*Expulsion*

50.     When spring break ended, John had still not heard anything about the status of his case. He reached out to the Associate Dean, who put him in touch with members of Bentley's student conduct team.

51.     On March 18, 2025, John met with members of the student conduct team, who informed him that he would have a hearing and that he would have a chance to submit a written statement for the Student Conduct Board (the "Conduct Board"). They followed up with an email providing guidance on how to prepare the written statement, and offering to review a draft of the statement.

52.     Pursuant to the Bentley University code of conduct, John was charged with five violations: complicity; fraud; malicious behavior; maintaining the Bentley core values; and psychological harassment.

53. John received a list of the charges against him in the pre-hearing packet, which was shared with him on March 21, 2025, six days before the hearing. The list did not specify what conduct John had allegedly engaged in for each violation.

54. Student A, Student B, Student C, Student F, and Student G were also charged with the same disciplinary violations, except that only Student F and John were charged with "psychological harassment." Student E was the only alleged "harmed party" to participate in the hearing process; Student D was also listed as a harmed party, but did not choose to take part.

55. According to the Bentley University student handbook, "psychological harassment" is "behavior that represents bullying, undermining a person's sense of self-worth or self-esteem, constant criticism, possessiveness, damaging possessions, blackmailing, coercion, threats, intimidation, diminishing a person's abilities, name-calling, public humiliation, and damaging a person's relationship with others."

56. Pursuant to the Bentley Conduct Process, only "Level III" cases permit a sanction of suspension or expulsion.

57. Psychological harassment is the only charge levied against John specifically identified as a Level III offense.

58. The student conduct hearing was scheduled for March 27, 2025.

59. John received a pre-hearing letter that stated he needed to submit his personal statement 48 hours in advance to be considered by the Conduct Board.

60. John submitted his personal statement on March 24th so that the Conduct Board could read and consider it prior to the hearing.

61. In his email transmitting the statement to the Student Conduct office, John wrote that he was attaching "a word document of my Personal Statement for the Conduct Board to read prior to hearing that will be taking place on March 27th."

62. Elizabeth Kissane, Bentley's Director of Student Development, Conduct and Care, wrote back to John, raising a concern about a part of his statement in which he described contact with his professors and efforts to stay caught up with coursework during his interim suspension.

63. John responded to Ms. Kissane's email to clarify how limited his contact with professors had been, and that he had not come to campus in violation of his interim suspension and asked that the hearing package be updated to reflect that information.

64. Ms. Kissane responded that the "Board would be made aware of the disclosure of completing coursework and engaging with faculty while on an Interim Suspension," but that John could address the issue in his opening statement to the Conduct Board.

65. No one at Bentley told John that he had an opportunity to make changes to his statement to the Conduct Board or that the statement he submitted on March 24th had not been given to the Conduct Board.

66. At the outset of his oral opening statement to the Conduct Board, John asked if everyone had reviewed his written statement, and offered to provide a link to it in the chat if anyone had not read it. The members of the Conduct Board smiled at him but said nothing. John proceeded to give a brief, relatively undetailed opening, believing that the Conduct Board had already read the more detailed description of events contained in his written statement.

67. During the hearing John referenced his personal statement multiple times because he reasonably believed that the Conduct Board had it and had read it.

68. Unbeknownst to John, his personal statement was not uploaded as part of the hearing documents until hours after the hearing concluded and the Conduct Board had likely made its decision.

69. Because Bentley failed to upload John's personal statement, the Conduct Board did not have full awareness of what information he had shared. On information and belief, some of his

answers were confusing or seemed evasive because he was referencing his written statement, which they had not read. As a result of John's confusion about his statement, the Conduct Board incorrectly concluded that John "was repeatedly dishonest and consistently withheld information during the hearing, violating the Core Values of Caring, Honesty, and Respect."

70. As of the beginning of the hearing, John still did not know what allegations formed the basis for the charge of "psychological harassment."

71. During the hearing, Student E testified that John had never threatened him. He claimed that John had refused to engage with him about the Venmo transactions (testimony that John contradicted) and that on February 27, 2025, he had approached John and gave him two options—repay his lost money or he was going to the police. Student E said that John told him that he had nothing to do with the scam, didn't know what was going on, and walked off.

72. The interaction between John and Student E took place at a Bible Study group. If John had received adequate notice of the allegation that this exchange was "psychological harassment," he could have produced witnesses to what he did and did not say in that exchange.

73. Student C and Student B testified that Student A introduced them to the "opportunity" to make money from Venmo. Student A confirmed that he approached them about the idea and that he (unlike John) made money for introducing them to the Venmo scam. Student G also testified that he approached John about the possibility of making money from Venmo, not the other way around.

74. After the hearing, the Conduct Board found John responsible for all charges.

75. The Conduct Board decided that John should be the only student expelled from the University, even though other students had engaged in identical conduct and earned more money from it.

76. Despite Student E's testimony, which did not describe John engaging in any threatening behavior, the Conduct Board found John responsible for psychological harassment based on their interactions.

77. The Conduct Board's findings misrepresented the testimony of other students at the hearing in several respects, including in its claim that Student G and Student C described John as the first one to reach out to them about the scam opportunity.

78. Another student received a suspension, while most of the students who participated in Eli's transactions were placed on academic probation.

79. None of the students who would be playing on an athletic team for Bentley in the fall were expelled—even those who made far more money than John from the scam and who did not make any effort to reimburse teammates who lost money.

80. After the hearing, John learned that his written statement had not been provided to the Conduct Board. Student Conduct personnel initially claimed that this was because they were waiting for him to amend his statement—though they had not previously told him he could do so—and then stated that none of the parties' statements were provided to the Conduct Board before the hearings.

*The Appeal*

81. John submitted a timely appeal to Dean Andrew Shepardson arguing lack of fair process and undue hardship.

82. John claimed that his "right to a fair and complete hearing process was compromised" due to the failure to provide his personal statement to the Conduct Board.

83. John claimed that the Conduct Board decision contained several factual inaccuracies regarding his level of involvement, financial gain, and responsibility for psychological harassment.

84. John claimed that the Conduct Board, failed to consider that he used his personal savings to compensate Student D and Student E a total of $5,750, despite having received substantially less money from the Venmo transactions.

85. Finally, John claimed that he was held to a disciplinary standard and punished with a sanction that was not applied equally to the others involved.

86. On information and belief, the Conduct Board hearing was not recorded.

87. Dean Shepardson declined to grant John a new hearing or alter his sanction.

88. In a meeting with John after his expulsion, Dean Shepardson claimed to have listened to the hearing and taken note of all the evidence.

89. Because the hearing was not recording, it was not possible for Dean Shepardson to meaningfully investigate John' claims about the hearing testimony.

90. Due to his expulsion, John will not graduate or receive his degree from Bentley.

91. Due to Bentley's denial of a degree, Bryant University will not allow John to enroll in its MBA program or join its athletic team.

92. The loss of what would have been the first college degree in their family has been devastating for John and for his parents and siblings.

93. As a result of Bentley's actions, John has suffered significant professional, reputational and financial damages. These damages are continuing.

## COUNT I
*Breach of Contract*

94. John re-avers paragraphs 1-93 as if fully set forth in this count.

95. To assure compliance with legal standards, encourage acceptable behavior and manage students' reasonable expectations, Bentley maintains a variety of policies and procedures that are published in the *Student Handbook*.

96. The Conduct Process contained in the *Student Handbook* affords John rights that are contractual in nature.

97. The Conduct Process entitles John to, *inter alia*, a "fair hearing" with "an impartial evaluation" of his conduct.

98. The Conduct Process entitles John to "ample notice of the hearing" that includes "a summary of the violation to be discussed."

99. The Conduct Process is based on the principles of restorative justice, which "seeks to examine the harmful impacts of a decision and then determines the opportunities to repair the harm while holding the person who caused it accountable."

100. According to the *Student Handbook,* the "Conduct Board members create spaces that allow for productive conversations, free of judgment."

101. Pursuant to the Conduct Process, sanctions "are intended to provide accountability for the students while balancing the . . . restorative philosophy, which is to provide educational and reflective opportunities."

102. When determining sanctions, the Conduct Board must consider the "seriousness of the responsible violations, conduct history of the student and information shared during the conduct process."

103. During his nearly four years at Bentley, John only had one minor conduct violation for having a candle in his dormitory room.

104. None of the other participants in the Venmo transactions received an interim suspension.

105. In this instance, Bentley failed to afford John his right to have the Conduct Board determine "the validity of the alleged violations brought against [him] and tak[e] appropriate action."

106. In this instance the interim suspension prejudiced John's appearance before the Conduct Board as he was unfairly branded a danger to the Bentley community and presumed to be the ringleader.

107. Bentley breached the terms of its contract with John by failing to provide a copy of his written statement to the Conduct Board prior to the hearing.

108. Bentley breached the terms of its contract with John by wrongfully suspending him before considering John's response or performing a minimum level of investigation.

109. Bentley breached the terms of its contract with John by failing to give him notice of the basis for the charge of "psychological harassment" sufficient to permit him to meaningfully respond to and present evidence regarding that charge.

110. Bentley breached the terms of its contract with John by imposing an unduly harsh sanction, failing to adhere to the principles of restorative justice, or consider the absence of a meaningful disciplinary history during his nearly four years as a student.

111. Bentley breached the terms of its contract with John by selecting sanctions based in whole or in part on where he and the other participants were playing on the Team next season.

112. Bentley breached the terms of its contract by failing to record the hearing, thus denying John the opportunity to meaningfully appeal from the Conduct Board's findings.

113. Bentley breached the terms of its contract with John by failing to grant his appeal despite the lack of any basis for a finding that he was responsible for psychological harassment.

114. Bentley breached the terms of its contract with John by failing to grant his appeal despite findings by the Conduct Board that were based on supposition and contradicted by documents and witness testimony.

115. Bentley breached the terms of its contract with John by failing to grant his appeal given that he was scheduled to graduate in three weeks, received a much more severe penalty than the other participants and had no serious conduct history during his nearly four years at Bentley.

116. Bentley's actions were arbitrary and capricious, breached the Student Conduct Process, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

117. As a direct and foreseeable consequence of these breaches, John sustained damages which will continue given his lack of a degree and inability to continue his education at Bryant University.

## COUNT II
*Breach of the Covenant of Good Faith and Fair Dealing*

118. John re-avers paragraphs 1-117 as if fully set forth in this count.

119. Every contract contains within it an implied covenant of good faith and fair dealing.

120. Bentley breached that covenant by depriving John of basic fairness and pursuing its adjudication in an unfair and biased manner.

121. Bentley further breached that covenant by singling out John, the only player charged with misconduct who did not plan to play for Bentley the following year, for interim suspension and expulsion.

122. As a direct and foreseeable consequence of these breaches, John sustained damages which will continue given his lack of a degree and inability to continue his education at Bryant University.

WHEREFORE, the Plaintiff, John Smith, requests that the Court:

a) Restrain and enjoin Defendant Bentley University from implementing his expulsion and order a new conduct hearing;

b) Award him damages for breach of contract in an amount exceeding $75,000 to be proven at trial; and

c) Award him his costs.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, the undersigned hereby swears under pains and penalties of perjury that the facts stated herein are true and accurate to the best of his knowledge.

*John Smith*

Dated: August 19, 2025

The Plaintiff, John Smith,
By his Attorneys,

/s/ J. Richard Ratcliffe
J. Richard Ratcliffe, BBO#412513
Ratcliffe Harten Galamaga LLP
40 Westminster Street, Suite 700
Providence, RI 02903
Tel: (401) 331-3400
rratcliffe@rhgllp.com

Ruth O'Meara-Costello, BBO #667566
Law Office of Ruth O'Meara-Costello
875 Massachusetts Ave., Ste. 31
Cambridge, MA 02139
617-658-4264
ruth@ruthcostellolaw.com