**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN SMITH,<br><br>      Plaintiff,<br><br>vs.<br><br>BENTLEY UNIVERSITY,<br><br>      Defendant. | )<br>)<br>)<br>)  Case No.: **1:25-cv-12317**<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Defendant Bentley University's motion to dismiss lacks merit because it is based on the questioning of the existence of a contract between itself and Plaintiff John Smith, and the breach of that contract and the covenant of good faith and fair dealing.  The argument depends upon multiple questions of fact, which John has plausibly alleged with ample detail.  For the reasons set forth herein, the motion must be denied.

**FACTUAL BACKGROUND**

At the start of the 2024-2025 school year, John Smith was a senior at Bentley University, where he was an accomplished and celebrated student athlete. (Compl. ¶¶ 17-20.) He was a first-generation college student, a person of color, the child of an immigrant parent, and a representative of an underrepresented community. (*Id.*¶ 15.) He planned to use an additional year of athletic eligibility to attend Bryant University as an MBA student and represent that institution as an athlete. (*Id.* ¶¶ 21-22.) Instead, he was expelled in the spring semester, shortly before his scheduled graduation. (*Id.* ¶¶ 75, 87, 90.)

John, and many other members of his athletic team, were caught up in a Venmo scam in which an individual who contacted John via Snapchat under the name "Eli" would direct the students to transfer money using Venmo and then distribute funds among them. (*Id.* ¶¶ 23-38.)

Numerous members of the team participated in this scheme, but ultimately it resulted in Venmo freezing students' accounts, some students losing money, and an investigation by the Bentley Police. (*Id.* ¶¶ 39-44.) John was the only student involved who had opted to play for another team in the upcoming athletic season; the other students were all scheduled to play for Bentley. (*Id.* ¶ 49.) When the situation came to light, Bentley placed John, and only John, on an interim suspension. (*Id.* ¶¶ 46, 49.) John personally reimbursed the students who lost money for the full amount of their losses, which far exceeded the money that he had earned from the scam. (*Id.* ¶¶ 23-38, 48.)

Bentley held a conduct hearing for the involved students in March 2025. (*Id.* ¶ 58.) Six days before the hearing, Bentley provided John with a list of the charges against him, but did not specify what conduct John had allegedly engaged in for each violation. (*Id.* ¶ 53.) The offense that the student handbook identified as most serious was "psychological harassment," but Bentley did not explain what conduct John had engaged in that qualified as such harassment. (*Id.* ¶¶ 52-57.) Five other players on John's team were charged with the same disciplinary violations, but only one other student was charged with "psychological harassment." (*Id.* ¶ 54.) One of John's teammates participated in the hearing process as a "harmed party." (*Id.*)

In the lead-up to the hearing, Bentley's student conduct team emphasized the importance of the opportunity to submit a written statement for the consideration of the Student Conduct Board. (*Id.* ¶ 51.) They warned that John was required to submit such a statement 48 hours in advance if he wanted the Board to consider it. (*Id.* ¶ 59.) John submitted his statement on March 24th, attached to an email in which he explained that he was attaching the statement "for the Conduct Board to read *prior to hearing.*" (*Id.* ¶ 61 (emphasis added).) Bentley's Director of Student Development, Conduct and Care, wrote back, raising a concern about whether his

statement revealed that he had violated his interim suspension in efforts to stay caught up with his coursework. John wrote back to clarify his conduct. The Director responded that the "Board would be made aware of the disclosure of completing coursework and engaging with faculty while on an Interim Suspension," and told John that he could address that issue in his opening statement to the Conduct Board. (*Id.* ¶¶ 62-64.) Neither she nor anyone else at Bentley told John prior to the hearing that he had an opportunity to make changes to his statement, nor that the statement he submitted would not be provided to the Board. (*Id.* ¶ 65.)

At the hearing, John began his opening statement by asking the Board members if they had reviewed his statement, offering to provide a link if not. The Board members smiled at him and said nothing. He gave a brief and undetailed opening, believing that they had already read his statement. (*Id.* ¶ 66.) In fact, the statement had not been shared with the Board. (*Id.* ¶ 68.) When answering questions, John frequently referenced his personal statement, with the result that his answers were likely confusing or seemed evasive. (*Id.* ¶ 69.) After the hearing, when John learned that the Board had not received his statement, Bentley student conduct personnel first claimed that they had not shared the statement because they were waiting for him to revise it, then said that none of the parties' statements were provided to the Board before the hearing. (*Id.* ¶ 80.)

As of the beginning of the hearing, John still did not know what alleged conduct was the basis for the charge of "psychological harassment," which on its face has no relationship to the Venmo scam. (*Id.* ¶ 70.) After the hearing, he was found responsible for all of the charges that he faced, including the harassment charge. (*Id.* ¶ 74.) The Board explained only then that the psychological harassment charge was based on his interactions with a teammate (referred to in the Complaint as Student E). (*Id.* ¶ 76.) Student E testified at the hearing that John had never

threatened him; he claimed that John refused to engage with him about the Venmo transactions and that on February 27, 2025, he approached John and gave him two options: repay the money Student E lost, or Student E would go to the police. John responded that he had nothing to do with the scam, didn't know what was going on, and walked off. (*Id.* ¶ 71.) The Board misrepresented this testimony. (*Id.* ¶¶ 76-77.) This interaction took place at a Bible study group; if John had known before the hearing that it was the basis for the most serious charge he was facing, he could have produced witnesses to what was said, to rebut the charge of "psychological harassment." (*Id.* ¶ 72.)

The Board's findings misrepresented the hearing testimony in other ways as well. The Board claimed that Students G and C testified that John reached out to them about the scam opportunity. (*Id.* ¶ 77.) In fact, Student C testified that another student ("Student A") approached him about the idea, testimony that Student A confirmed, and Student G testified that he approached John about the possibility of participating, not the other way around. (*Id.* ¶ 73.)

As noted above, John was the only student expelled following the hearing. (*Id.* ¶¶ 78-79.) Students who would be playing for Bentley's athletic team in the fall were not expelled—even those who made far more money from the scam than John and did not make any effort to reimburse the teammates who lost money. (*Id.* ¶ 79.)

After his expulsion, John submitted an appeal arguing that his right to a fair hearing was compromised by the failure to provide his statement to the Conduct Board; that the Conduct Board decision was factually inaccurate as to his level of involvement, financial gain, and responsibility for psychological harassment; that the Board failed to consider his efforts to make things right by reimbursing his teammates; and that he was held to a disciplinary standard and punished with a severity not applied equally to the others involved. (*Id.* ¶¶ 81-85.) Dean Andrew

Shephardson, the decision-maker on appeal, denied the appeal. (*Id.* ¶ 87.) In a subsequent meeting with John, he claimed that he had listened to the hearing and taken note of all of the evidence; in fact, the hearing was not recorded. (*Id.* ¶¶ 88-89.)

## STANDARD OF REVIEW

In reviewing a Rule 12(b)(6) motion, the Court must determine whether the factual allegations in the plaintiff's complaint set forth "a plausible claim upon which relief may be granted." *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 71 (1st Cir. 2014), citing *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 353 (1st Cir. 2013). In making this determination, the court "must take all of the pleaded factual allegations in the complaint as true." *Foley*, 772 F.3d at 71, citing *Watterson*, 987 F.2d 1, 3 (1st Cir. 1993); *see also Sonoiki v. Harvard Univ.*, 37 F.4th 691, 696-697 (1st Cir. 2022). A plaintiff need not "submit evidence to defeat a Rule 12(b)(6) motion, but need only sufficiently allege in their complaint a plausible claim." *Foley*, 772 F.3d at 72. The court draws "reasonable inferences . . .in the pleader's favor." *Id.,* citing *Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1, 12 (1st Cir.2011).

## ARGUMENT

Plaintiff, John Smith, paid Bentley tuition in exchange for education, yet Bentley would have this Court find that no obligations flowed from this transaction, and no duty of good faith. It is an extreme position, and while Bentley may have been free to change the terms of its Handbook or announce new procedures, it never did. Therefore, John's expectation that the Handbook procedure would apply was reasonable, and Bentley's failure to afford John that procedure, and carry it out in good faith, breached his reasonable expectations and fair interpretation of the contract. The following addresses breach of contract and breach of the covenant of good faith and fair dealing respectively.

## A. Breach of Contract

Under Massachusetts law, to establish a breach of contract, Plaintiff must show "an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 690 (2016), citing *Singarella v. City of Boston*, 342 Mass. 385, 387 (1961). Whether a contract exists is a question of fact. *Marks v. Ross Univ. Sch. of Veterinary Medicine, Inc.*, Mass. Appeals Court no. 24-P-1016 (2025) slip op at 11-12, quoting *LeMaitre v. Mass. Turnpike Auth.*, 70 Mass. App. Ct. 634, 637 (2007). Defendant's motion challenges the elements of existence of a contract, and breach. (Def.'s Memo. 9.) In fact, Plaintiff's complaint establishes both elements.

### 1. Plaintiff's payment of tuition to Bentley in exchange for education indicates they were in a contractual relationship.

The relationship between John Smith, a student at Bentley, and Bentley, the university which admitted him to its educational program and was educating him in exchange for his payment of tuition in agreed-upon amounts, was a contractual relationship. *See Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 316 (1st Cir. 2022) (citing *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007)). Whether or not the student handbook set forth contractual terms, the relationship between John and Bentley reflected a contract under which John would pay tuition in exchange for education, and ultimately, a degree. Numerous courts have recognized the essentially contractual nature of these interactions. *See Govan v. Trs. of Bos. Univ.*, 66 F. Supp. 2d 74, 82 (D. Mass. 1999) (citing *Russell v. Salve Regina Coll.*, 890 F.2d 484, 488 (1st Cir. 1989)); *Dinu v. President & Fellows of Harvard Coll.*, 56 F.Supp.2d 129, 130 (D. Mass. 1999); *Guckenberg v. Bos. Univ.*, 974 F. Supp. 106, 150 (D. Mass. 1997); *Mass. Inst. of Tech. v.*

*Guzman*, 90 Mass. App. Ct. 1102, 56 N.E.3d 894 (Mass. App. 2016) (unpublished). The existence of such a contract does not depend on the wording or even the existence of a specific writing: "In the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties." *Durbeck v. Suffolk Univ.*, 547 F. Supp. 3d 133, 145 (D. Mass. 2021) (holding that plaintiffs state a plausible claim for breach of an implied-in-fact contract for an in-person experience for the entire spring 2020 semester, despite the lack of a specific promise that instruction would be in-person). Bentley's assertion that there was "no contract" between it and John because its Handbook contained language claiming that the Handbook itself did not bind the university makes absolutely no sense given the fundamental relationship between these parties.

Massachusetts law imposes inherent obligations on institutions of higher education that impose discipline on their students. These include an obligation to provide students with, at a minimum, "basic fairness." *Schaer v. Brandeis Univ.*, 432 Mass. 474, 481, 735 NE 2d 373 (2000); *see also Coveney v. President & Trustees of College of Holy Cross*, 445 N.E.2d 136, 388 Mass. 16 (1983). This principle states, in essence, that "[a] private school may not arbitrarily or capriciously dismiss a student or do so in bad faith." *Driscoll v. Bd. of Trs. of Milton Acad.*, 70 Mass. App. Ct. 285, 873 N.E.2d 1177, 1187 (2007).  In cases where a student handbook promises such fairness, the guarantee of basic fairness may be essentially subsumed in that contractual promise. But it exists even absent such contractual language. *Doe v. Trs. of Boston Coll.*, 892 F. 3d 67, 87-88 (1st Cir. 2018) (*Doe v. BC I.*) Here, Bentley's handbook promised John a "fair hearing" with an "impartial evaluation" of his conduct, and "ample notice of the hearing" that includes "a summary of the violation to be discussed." (Compl. ¶¶ 97-98.) If Bentley had not made these promises—or if the Court finds that the handbook does not set forth

the terms of the parties' contract—they would still be required because they are inherent in the concept of "basic fairness," if it is to mean anything at all. In short, Bentley cannot escape the reality of its contractual relationship to John (and - its other students) by putting a disclaimer in its handbook.

### 2. Plaintiff's reliance on the Handbook was reasonable because Bentley did not communicate any different procedure in the runup to Plaintiff's hearing.

The claim that the Handbook itself was not contractual also does not pass muster. "To determine whether select terms of a student handbook are contractually enforceable, Massachusetts courts employ 'the standard of reasonable expectation,' that is, 'what meaning the party making the manifestation... should reasonably expect the other party to give [the terms].'" *G. v. Fay Sch.*, 931 F.3d 1, 12 (1st Cir. 2019), quoting *Driscoll v*, 70 Mass. App. Ct. at 293, 873 N.E.2d at 1185 (additional quotation marks and citation omitted). Regardless of the existence of specific contractual terms contained in a handbook, under Massachusetts law "[a] private university, college, or school may not arbitrarily or capriciously dismiss a student." *Coveney*, 445 N.E.2d at 138-139, 388 Mass. at 19. Students may be dismissed, however, for "violations of reasonable rules and regulations of a school." *Id.* Such rules and regulations must come from somewhere. Bentley's Student Handbook contains a Code of Student Conduct, and warns students specifically that, "Attendance at Bentley bears with it responsibilities to obey the laws of the commonwealth of Massachusetts and federal laws, as well as the policies of the university on or off campus." (Ex. H at 59.) The disciplinary process in this case charged John and the other students with disciplinary offenses that were defined in the Handbook (Ex. H at 60, 63-64, 67, 71); it was reasonable that John would expect the school to apply those definitions in evaluating his conduct.

Specific language in the Handbook also encourages students to rely on its terms. In its opening message, addressed to Bentley students, it states that the Handbook, "outlines the resources and opportunities provided to all students as well as the policies and procedures students are expected to follow," and encourages students "to read the manual before arriving on campus and continue to use it as a resource during your time at Bentley." It adds that, "The policies and procedures outlined in this handbook have been developed over time with input from all members of the Bentley community, including students." (Ex. H at 8.) Even in the "disclaimer" that purports to explain that the Handbook does not create contractual rights, the Handbook commits that if Bentley makes changes to the policies contained therein, "Changes will be sent directly to students via email."

Not every disclaimer in a handbook or manual effectively avoids a finding of contractual obligation. In *Ferguson v. Host Int'l, Inc.*, 53 Mass. App. Ct. 96, 757 N.E.2d 267 (2001), the Massachusetts Appeals Court found that an employee reasonably relied on a handbook promising progressive discipline despite paragraphs in the handbook that "disclaim[ed] any intent to confer contractual rights on employees," and "reserve[d] the right to amend or cancel the manual without notice as circumstances require." The Appeals Court found that following the Supreme Judicial Court's decision in *O'Brien v. New England Tel. & Tel., Inc.*, 422 Mass. 686, 691-694 (1996), this was insufficient, holding that it "properly could be viewed by the fact finder as the functional equivalent of fine print..." *Ferguson*, 53 Mass. App. Ct. at 103. Here, in light of language encouraging students to rely on the Handbook as the source of their rights and obligations, and in the context of the overall contractual relationship between the parties, it was reasonable that students, including John, would rely on the Handbook as defining their rights and obligations as students, and would understand that if they did not violate the Handbook's

provisions, they would not be disciplined—and that if they were accused of violations, Bentley would use the procedures described in the Handbook to resolve those claims.

At worst, it is ambiguous whether or not the Handbook's terms were part of the contract between Bentley and John. Ambiguity in contractual terms "can't be resolved on a 12(b)(6) motion." *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 704 (1st Cir. 2022). "It cannot be said as a matter of law that the plaintiff could not reasonably believe that the [university] would adhere to the portions of the manual establishing the system of progressive discipline and the guarantee of fair treatment, rather than apply them only when it chose." *Ferguson*, 53 Mass. at 103. At a minimum, John is entitled to conduct discovery about how Bentley disseminates its Handbook, how Handbook provisions are adopted, and whether students are asked to sign or otherwise agree to the provisions of the Handbook, before the Court makes a determination as to whether the Handbook does or does not contain contractual terms that are binding on the parties. *See, e.g. Pacella v. Tufts Univ. Sch. of Dental Med.*, 66 F. Supp. 2d 234, 241 (D. Mass. 1999) (finding that relevant factors include whether there was any negotiation or manifestation of assent to the handbook and whether school called special attention to the handbook in relevant correspondence).

### 3. Bentley violated John's fair interpretation of the contract by denying him the process the Handbook specified.

Among Bentley's promises to John were "ample notice" of disciplinary charges, the opportunity to provide a written statement, a determination guided by the evidence presented, a sanction based on restorative justice, and a meaningful right to appeal. He received none of the above. Bentley would have this Court toss aside its representations to John as mere puffery. But, at the motion to dismiss stage, courts review claims that a university breached its contractual obligations to a student using the reasonable expectation standard, which "is focused on the

student's interpretation of the contract's terms, assessing 'what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.'" *Sonoiki.*, 37 F.4th at 709 (quoting *Schaer*, 735 N.E.2d at 378). As the First Circuit has explained, this standard is favorable to the student plaintiff:

> This standard allows for a student's reasonable expectations to be different from the interpretation the university places on the same terms. Moreover, a student's expectation can be reasonable even if the precise expectation is not stated explicitly in the contract's language but, instead, when the student's expectation, viewed objectively alongside the express terms of the contract, is based on the student's fair interpretation of the contract's provisions.

*Id.* "At this stage in the litigation, the court must accept as true the factual allegations made by Doe and must make any reasonable inferences favorable to his position both with respect to determining what a student may have reasonably expected terms in the Student Handbook to mean and whether the College failed to meet those expectations." *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 215 (D. Mass. 2017.)  The following specifies how Bentley failed to perform in the manner John reasonably expected.

*(a) Bentley failed to provide John "ample notice" of the psychological harassment charge because it did not inform him who he allegedly harassed or how.*

John was not given notice of the conduct that allegedly constituted "psychological harassment." He was told that this was among the charges that he faced, and was able to look up the definition of that violation in the handbook—but was not given any information prior to the hearing about what he had allegedly done to violate this disciplinary provision.[1] Going into the hearing, he had never been informed who he allegedly had psychologically harassed, or how. Bentley's handbook promised "ample notice," that included a "summary of the violation to be discussed." (Compl. ¶ 98.) No such notice was provided. In this respect, John also did not receive the basic fairness to which he is entitled under *Schaer* as a student in Massachusetts. *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 603-604 (D. Mass. 2016) (holding that where, "having informed him of the formal charge," the university failed to provide a student "with the specific factual conduct alleged to have given rise to the charge" may "at a minimum," have "substantially impaired the fairness of the proceeding."); *Roe v. Northeastern Univ.*, No. 16-03335-C, 2019 WL 1141291, at *14 (Mass. Super. Ct. Mar. 8, 2019) (stating that "notice to [the student under investigation] is — as a matter of fundamental fairness inherent in any college process — essential prior to [a] hearing and any related appeal"). This breach was extremely consequential—if John had been provided with appropriate notice of which interactions were the

---

[1] Bentley attached, as Exhibit B to Def.'s Memo., what it claims is the Hearing Packet provided to John prior to the hearing. Notably, it describes the police investigation into the Venmo activities but does not describe any harassing or threatening conduct *whatsoever*. Plaintiff has moved to strike the bulk of the exhibits to Bentley's memo, but should the Court choose to consider them it should take note that Bentley's claim that the hearing packet gave John notice of the basis for the charge of psychological harassment is simply false. (Compare Def.'s Memo. 13-14 to Ex. B.)

basis for this charge, he could have produced witnesses who would have exonerated him. (Compl. ¶ 72.)

> (b) *Bentley's explanations as to why it failed to provide John's statement to the Board Members are shifting and contradictory.*

As described above, Bentley employees involved in the conduct process heavily emphasized the importance of John's personal statement. The statement was discussed in John's March 18 meeting with members of the student conduct team. (Compl. ¶ 51.) After that meeting, the conduct team emailed John with guidance on how to prepare the statement, and offers to review a draft. (*Id.*) They later followed up again about the statement, to remind John that it had to be submitted 48 hours in advance of the hearing to be considered by the Board. (*Id.* ¶ 59.) A reasonable student would understand from these communications that the statement was an important part of the process and that if he submitted it 48 hours before the hearing, the Board would consider it. John did have that understanding, as his emails to Bentley's conduct office demonstrate: when he sent in his statement, three days before the hearing, he wrote that he was attaching it "for the Conduct Board to read *prior to* hearing." (*Id.* ¶¶ 60-61 (emphasis added).) At the hearing itself, he reiterated that understanding, asking directly whether the Board had read his statement; the members smiled but did not respond, and so he still believed that they had received and read the statement. (Compl. ¶ 66.) Bentley's failure to provide the statement to the Board prior to hearing—and its failure to inform John prior to the hearing that the Board members would not receive his statement—breached his right to a fair proceeding.

Bentley's argument to the contrary rests on two propositions: first, that the document was not submitted in order to protect John, and second, that the document would have made no difference. (Def.'s Memo. 14.) It is a fair inference from the facts alleged in the Complaint that the first proposition is simply false and was invented only after John questioned whether the

Board members had received his statement. No one at Bentley told John before the hearing that they were waiting for him to revise his statement, or even that he had the opportunity to do so. (Compl. ¶¶ 65, 80.) On the contrary, their messages to John insisted that he must provide his statement by a deadline well in advance of the hearing, from which he reasonably understood that the Board members would receive it before the hearing took place. (*Id.* ¶ 59.) Their explanations were also shifting and contradictory, suggesting first that they were waiting for John to revise the statement, and then claiming that none of the statements were uploaded before the hearing (an explanation that completely undercuts the claim that they were waiting on John to do anything.) (*Id.* ¶ 80.) And they expressly told John prior to the hearing that he would have to explain to the Board whether he had violated the terms of his interim suspension—suggesting both that John could *not* revise his statement, and that the Board would receive it prior to the hearing. (*Id.* ¶ 64.) Inferably, they simply misled John about how his statement would be handled—whether inadvertently or maliciously—and then struggled to justify their actions after the fact.

Nor was the failure to upload the statement before the hearing harmless. As set forth in John's Complaint, he made his remarks to the Board in the understanding that they had already read his statement, and did not share everything that he would have if he knew that they had not received it. (*Id.* ¶ 66.) He also frequently referenced his statement rather than directly answering questions as he would have if he knew that the Board had not read and did not have his statement. (*Id.* ¶ 69.) The ultimate result was that he appeared dishonest—an impression that undoubtedly affected both the Board's findings and the severity of the sanction it imposed. (*Id.*)

(c) *The Board's findings are unsupported by the evidence at hearing because the student John allegedly harassed denied the harassment occurred.*

Bentley's decision finding John responsible for psychological harassment also rested on a misrepresentation of the testimony at the hearing; the Board's decision letter claimed that John had psychologically harassed Student E, while Student E's testimony itself disclaimed any such harassment. (Compl. ¶¶ 71, 76.) The Board made other findings, regarding John's culpability compared to other students, that were similarly unsupported by the actual evidence. (Compl. ¶¶.) Where there was no basis in the evidence for the Board's findings, Bentley's imposition on John, and its failure to grant his appeal, were both arbitrary and capricious and breached his reasonable expectations under his contract with Bentley. (Compl. ¶¶ 113, 114, 116.) Bentley makes no effort to grapple with discrepancies between the evidence at hearing and the Board's findings; indeed, it essentially simply ignores this claim. Other courts have found, however, that colleges may violate students' reasonable expectations by imposing discipline that is not supported by a preponderance of the evidence, *see Doe v. Amherst*, 238 F. Supp. 3d at 216, or by failing to grapple with evidence that is exculpatory, *see Doe v. Stonehill Coll. Inc.*, 55 F.4th at 327.

(d) *Bentley failed to provide a meaningful appeal because the decision-maker did not attend John's hearing and had no record of it.*

Bentley argues that John's claims "do not support a breach of contract claim, as the majority of these issues were thoroughly addressed in the Appeal Decision." It is not clear what possible basis Bentley has for contending that the denial of John's internal appeal has any bearing on this Court's resolution of his claims; Bentley cites no authority for this proposition and undersigned counsel is not aware of any. *See Doe v. W. New England Univ.*, 228 F. Supp. 3d 154, 168 (D. Mass. 2017) (upholding breach of contract and good faith claims despite university's denial of student's appeal).

Aside from the basic error in suggesting that this Court is in any way bound by Bentley's internal conclusions about John's claims, John's Complaint provides a factual basis from which the Court can infer that Bentley's review of John's case on appeal denied John basic fairness and failed to comply with its own procedures as articulated in its handbook. As John points out in his Complaint, it is extremely unclear what basis Dean Shephardson had for denying his appeal; Dean Shephardson did not attend the hearing, and it was not recorded, preventing any appellate decisionmaker from meaningfully evaluating John's claims. (Compl. ¶ 112.) This failure deprived John of his right, under the terms of the Student Handbook (Ex. H at 89), to an appeal.

> (e) *Bentley violated John's reasonable expectations by selecting sanctions on the bases of which of the accused would play for Bentley in the upcoming season.*

John alleges in his Complaint that Bentley breached his reasonable expectations under their contract by "selecting sanctions based in whole or in part on where he and the other participants were playing" their sport in the next season. (Compl. ¶ 111.) There is ample evidence in his Complaint from which the Court can infer that this is true. Of all the Bentley athletes involved in this case, only John intended to play for a school other than Bentley in the upcoming athletic season. He made less money than other students who received a lesser sanction, and he made serious, concrete efforts to amend for his conduct by repaying the money that other students lost. (Compl. ¶¶ 48, 75.) And he was the only student that Bentley expelled. (Compl. ¶ 75.)

Bentley's claim that the "undisputed record" shows that "Plaintiff's central involvement" was the distinguishing factor is simply false. (Def.'s Memo. 15.) At this stage of the case, the "undisputed record" consists solely of Plaintiff's Complaint, which makes clear no such thing.[2]

---

[2] As discussed in Plaintiff's Motion to Strike Exhibits, Dkt. 19, filed November 10, 2025, Bentley's attempt to change the record here by presenting self-serving documents and asking the Court to accept their claims as true should fail.

*f. Failure to Impose a Proportionate Sanction.*

Bentley's Student Handbook informs students that its Conduct Process is based on the principles of restorative justice, and "seeks to examine the harmful impacts of a decision and then determines the opportunities to repair the harm while holding the person who caused it accountable." (Compl. ¶ 99.) Conduct Board members, the Handbook says, "create spaces that allow for productive conversations, free of judgment." (*Id.* ¶ 100.) Sanctions are "intended to provide accountability for the students while balancing the . . . restorative philosophy, which is to provide educational and reflective opportunities." (*Id.* ¶ 101.) In determining sanctions, the Conduct Board must consider the "seriousness of the responsible violations, conduct history of the student and information shared during the conduct process."

Instead of the thoughtful, student-focused process that the Handbook describes, John found himself treated callously and unfairly. Bentley placed him (and only him) on an interim suspension without giving him any opportunity to first share his version of events. (*Id.* ¶ 104, 108.) Although he had only one extremely minor prior disciplinary violation (for having a candle in his room as a freshman, *id.* ¶ 103), had an otherwise excellent record of contributions to Bentley's community, and had done everything in his power to make things right with those affected by his conduct, Bentley singled him out for expulsion, just weeks before his graduation. (*Id.* ¶¶ 110, 115.) A reasonable student in his shoes would not have expected this treatment from Bentley based upon the assurances in its Handbook.

## B. Breach of Duty of Good Faith and Fair Dealing

All contracts in Massachusetts include an implied duty of good faith and fair dealing. *Starr v. Fordham*, 420 Mass. 178, 184 (1995). The Massachusetts Supreme Judicial Court is clear that a Plaintiff need not affirmatively plead bad faith; rather, a "showing of a lack of good

faith is required." *Nile v. Nile*, 432 Mass. 390, 398-399 (2000). The implied covenant "may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship, but a party may breach the covenant of good faith and fair dealing without breaching any express term of that contract." *Doe v. Brandeis*, 177 F. Supp. 3d at 612. "The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." The school's "independent duty to provide basic fairness" is rooted in this implied covenant. *Doe v. BC I*, 892 F.3d at 87.

John has established a breach of the duty of good faith and fair dealing in this case because he has set forth numerous ways in which Bentley's adjudication lacked good faith. As discussed above, Bentley selectively villainized John, the one student athlete who would be playing for a different institution and not for Bentley in the upcoming season. It failed to provide him with the appropriate notice that would have allowed him to defend himself on one of the most serious charges against him. It misled him about the information that was shared with the Board, to the detriment of his ability to meaningfully present his case. It misrepresented the evidence at the hearing in its decision, and did not record the hearing, making it impossible for John to correct its errors on appeal. This conduct was sufficient to establish a violation of the breach of its duty of good faith and fair dealing. *See, e.g. Doe v. Amherst Coll.*, 238 F. Supp. 3d at 220 (holding that "Doe has alleged facts from which a jury could reasonably infer the College acted in a manner that prevented him from receiving the 'thorough, impartial and fair' investigation promised in the *Student Handbook* and thereby also denied him a fair adjudication of the complaint against him.").

Bentley argues that John's claim of violation of the implied covenant must fail because no enforceable contract exists. As discussed at length above, John and Bentley's relationship was inherently contractual and they both therefore owed one another an implied duty of good faith and fair dealing, which exists in every Massachusetts contract. *See id.*

**CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss should be denied.

**REQUEST FOR ORAL ARGUMENT**

In light of the importance of the issues, Plaintiff requests oral argument pursuant to L.R. 71(d).

Dated: November 17, 2025

The Plaintiff, John Smith,
By his Attorneys,

/s/ Ruth O'Meara-Costello

J. Richard Ratcliffe, BBO#412513
Ratcliffe Harten Galamaga LLP
40 Westminster Street, Suite 700
Providence, RI 02903
Tel: (401) 331-3400
rratcliffe@rhgllp.com

Ruth O'Meara-Costello, BBO #667566
Law Office of Ruth O'Meara-Costello
875 Massachusetts Ave., Ste. 31
Cambridge, MA 02139
617-658-4264
ruth@ruthcostellolaw.com

**CERTIFICATE OF SERVICE**

I, Ruth O'Meara-Costello, certify that on the 17th day of November, 2025, this document was electronically filed through the Court's CM/ECF system and was served on all registered counsel of record.

/s/ Ruth O'Meara-Costello