**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **JOHN SMITH,** | |
| **Plaintiff,** | **Case Number: 1:25-cv-12317** |
| **v.** | |
| **BENTLEY UNIVERSITY,** | |
| **Defendant.** | |

## DEFENDANT BENTLEY UNIVERSITY'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION TO DISMISS

Defendant Bentley University ("University" or "Defendant") hereby submits this reply memorandum in response to Plaintiff John Smith's ("Plaintiff") Memorandum in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss ("Opposition") and in further support of Defendant's Motion to Dismiss ("Motion").

I. **Plaintiff's Opposition Does Not Establish Any Legally Cognizable Basis for a Breach of Contract Claim**

a. **Plaintiff's Opposition fails to provide any legally sufficient basis for asserting a breach of contract claim arising from a student handbook that contains a clear disclaimer.**

In attempting to support his breach of contract claim, Plaintiff's Opposition improperly ignores well-established precedent by recasting the dispute as one of "basic fairness," notwithstanding the Bentley Student Handbook's clear and unambiguous disclaimer. Rather than address this Court's holding in *Finnegan* and the other cases cited in Defendant's Motion, Plaintiff ignores the clear principle that a handbook with an express disclaimer allowing unilateral changes cannot create enforceable contractual promises. *See Finnegan v. Massachusetts Coll. of Pharmacy*

*& Health Scis. by & through Bd. of Trs.*, No. 23-CV-12997-DJC, 2024 WL 4772299, at *7 (D. Mass. Nov. 13, 2024).

Plaintiff's assertion that a contractual relationship arises solely from the nature of the parties' relationship and the payment of tuition provides no legal basis for a breach of contract claim based on alleged violations of the Bentley Student Handbook. He cannot manufacture a contractual relationship under the guise of "basic fairness," particularly where the Bentley Student Handbook contains an explicit disclaimer, and he identifies no authority supporting his claim that its terms are "required because they are inherent in the concept of 'basic fairness'." *See* Opposition at p. 8.

Here, Plaintiff seeks to impose a standard, unsupported by the case law, that would effectively negate the significance of student handbook disclaimers and deem all student handbooks binding contracts. In this case, the disclaimer appears at the beginning of the Bentley Student Handbook under a prominently bolded heading titled "Disclaimer" and the statement **"[t]his handbook is not intended to be, and is not, a contract between the university and its students"** is itself bolded. S*ee* **Exhibit H**, *Bentley Handbook: 2024 - 2025*, p. 11 (emphasis in original). There was plainly no attempt to obscure the disclaimer in fine print. Accordingly, Plaintiff cannot plausibly claim that it was reasonable for him to rely on the Bentley Student Handbook in the face of such a prominent and unambiguous disclaimer. Further, Plaintiff's reliance on older employment cases is unpersuasive, particularly in light of this Court's recent recognition in *Finnegan* of the legal effect of a disclaimer in a student handbook. *Contrast Ferguson v. Host Int'l, Inc.*, 53 Mass. App. Ct. 96, 103 (2001) (observing that the relevant clauses were buried in the general, introductory portion of the manual and could be deemed as fine print).

Plaintiff relies on older cases which articulate different standards depending on whether

the student handbook forms a binding contract. Where the handbook was found to constitute a contract, older courts examined whether the procedures followed fall within the reasonable expectations of the reader and whether the process afforded basic fairness. *See Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 724–25 (1st Cir. 1983). By contrast, those cases found that where no contractual right exists, courts apply a more deferential standard: so long as school officials act in good faith and have reasonable grounds for their decision, a student cannot successfully challenge a suspension or expulsion. *See id.* at 24 citing *Coveney v. President & Trs. of Holy Cross Coll.*, 388 Mass. 16, 19 (1983); *see also DMP v. Fay Sch. ex rel. Bd. of Trs.,* 933 F. Supp. 2d 214, 223 (D. Mass. 2013) (observing that under this standard "private schools are given broad discretion to meet their educational and doctrinal responsibilities and unless the school clearly abuses its discretion in enforcing its policies and regulations, courts will not interfere in the manner in which the school carries out such policies and regulations"). As explained in the Motion to Dismiss and further discussed below, even if the Court were to find the existence of a contract and adopt the standard suggested by the Plaintiff, he has no basis to challenge his expulsion because he has not alleged sufficient facts showing that the University acted in bad faith or without reasonable grounds in reaching its decision.

While courts in the First Circuit have recognized a denial of basic fairness as a viable theory of recovery, the "precise contours of such a claim are yet to be clearly defined," and the application of this theory as advanced by the Plaintiff is not supported by case law. *See Finnegan*, 2024 WL 4772299, at * 9 quoting *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 714 (1st Cir. 2022). Even if Plaintiff could demonstrate the basic fairness standard applies, which he cannot, the inquiry into basic fairness only requires the Court to assess whether the university provided "some minimum level of fair play" to the student during the disciplinary process. *See Doe v. Brandeis Univ.*, 177

3

F. Supp. 3d 561, 601 (D. Mass. 2016).  Further, a denial of basic fairness claim is distinct from a breach of contract claim and is "rooted in the implied promise of good faith and fair dealing." *Sonoiki*, 37 F.4th at 715–16. As such, it should not be conflated with the breach of contract claim.

### b. Plaintiff's Opposition fails to point to any reasonable expectations under the alleged contract that the University purportedly violated.

As an initial matter, as noted in *Finnegan*, at the motion to dismiss stage the court considers the student's reasonable interpretation of the contract's terms ***only after*** a contract has first been established. *See Finnegan*, 2024 WL 4772299, at *7. Plaintiff's asserted expectations arising from a purportedly contractual student handbook, particularly where the handbook contains an express disclaimer, is not enforceable and therefore cannot govern the Court's analysis even at the motion to dismiss stage. Here, Plaintiff improperly relies on cases where there was no dispute that the student handbook formed a contract between the university and the student. *See Sonoiki*, 37 F.4th at 703 (noting that neither party disputed that the student handbook was a binding contract or that Massachusetts contract principles applied); *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 215 (D. Mass. 2017) (noting that the college did not argue the student handbook was not a contract and therefore the court treated it as binding).

Regardless, even assuming a binding contract exists, the Complaint and the documents and communications it incorporates confirm that the Opposition fails to show any violation of the parties' reasonable expectations, and Plaintiff's claim to the contrary is without merit.  As discussed in Defendant's Motion, the University provided Plaintiff with more than sufficient notice of the harassment charge, including the identity of the individual involved and the nature of the allegations, fully satisfying any applicable notice requirements.

In the Opposition, Plaintiff erroneously claims that the hearing packet provided to the Plaintiff "describes the police investigation into the Venmo activity but does not describe any

4

harassing or threating conduct whatsoever." *See* Opposition at p. 12. As previously noted, Plaintiff received the hearing packet prior to the Conduct Board, which included University Police Report No. 25-000106, supplemental screenshots and photographs, and a document listing the charges against him along with relevant definitions—including the definition of psychological harassment. S*ee* **Exhibit B**, *Board Hearing Packet*; **Exhibit I**, *Charges and Definitions*. The Police Report consisted of various statements derived from student interviews conducted by law enforcement. S*ee generally* **Exhibit J**, University Police Report No. 25-000106 and supplemental screenshots and photographs ("*Police Report*"). In his interview, the victim who initially reported the Plaintiff to the police described how the Plaintiff repeatedly "harassed" him in an effort to compel him to transfer the money back to Plaintiff, and explained that the Plaintiff eventually stopped communicating with the reporting victim. *See id.* at p. 3. Further, the Decision Letter notes that Plaintiff caused significant psychological harm to the reporting victim by ignoring his attempts to contact the Plaintiff and by attempting to pressure the reporting victim not to report the stolen funds. *See* **Exhibit E**, *Decision Letter*, p. 4. Accordingly, the materials provided adequate notice that allegations of potential harassment and psychological harm to the reporting victim were being asserted and the basis for the finding against Plaintiff.

Second, as a matter of law, Plaintiff cannot show that the University violated any reasonable expectations regarding the posting or consideration of Plaintiff's personal statement, as reflected in the communications referenced and relied upon in the Complaint. Here, the communications between the Plaintiff and the University show that he did not send in a revised version of his personal statement after being notified that his statement included language in his personal statement to suggest that he had violated the terms of his interim suspension. S*ee* **Exhibit C**, *Email regarding Personal Statement Pre-Hearing*. Plaintiff cannot argue in good faith that he

was unaware of the expectation to submit a final revised statement, given that he admits in a follow-up email that he revised his personal statement on the same day he received the critique, yet elected not to submit it until after the hearing. This is evident in his email communications on March 27, 2025, in which he states the following: "I am sorry for the confusion **I made the corrections on Tuesday**, when [the Director of the Office of Student Development, Conduct & Care] had sent me the email regarding her concerns. This is the final version, and I would like for this to be uploaded to the hearing packet." *See* **Exhibit D***, Email regarding Personal Statement Post-Hearing* (emphasis added). Regardless, the communications make clear that the Conduct Board had access to his Personal Statement during their deliberations and prior to issuing a decision. *See id.* As such, the communications referenced in the Complaint demonstrate that Plaintiff cannot show that the University breached his right to a fair proceeding with respect to his personal statement.

Third, Plaintiff fails to identify any specific provision of the Bentley Student Handbook that the University allegedly violated in its appeal process, and mere disagreement with the denial of his appeal is insufficient. *See Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 36 (1st Cir. 2007) (finding no breach where appeal officer did not ignore handbook protections or act in bad faith); *Finnegan*, 2024 WL 4772299, at *9* (dismissing claim where college denied requested relief). As the Complaint and Opposition acknowledge, the handbook provides that students are afforded "[t]he opportunity to appeal the decision of the Conduct Board." S*ee* **Exhibit H**, *Bentley Handbook: 2024 - 2025*, p. 89. There is no dispute that Plaintiff was granted this opportunity and availed himself of it. He cannot impose additional requirements that are either absent from or explicitly contradicted by the Bentley Student Handbook. For example, Plaintiff argues that the University breached the contract by failing to record the hearing, yet the Bentley Student

Handbook clearly states that "no recordings of hearings are allowed," and there is no requirement that the Dean attend the hearing. *See id.* Moreover, the appeal decision itself, as referenced and relied upon in the Complaint, fully documents the basis for the denial, including Dean Shephardson's consideration of the appeal, the written statement, the materials presented to the Conduct Board, and the Conduct Board's decision. *See* **Exhibit G***, Appeal Decision.* This demonstrates that the University fully complied with the Bentley Student Handbook's procedures and, should the Bentley Student Handbook be determined to be a valid contract, Plaintiff was provided the protections to which Plaintiff was entitled to by the Bentley Student Handbook. Accordingly, Plaintiff's claim fails as a matter of law because he received all the procedures provided for in the Bentley Student Handbook, and his disagreement with the outcome does not create a contractual violation.

Finally, Plaintiff's claim that the University violated his reasonable expectations by allegedly failing to impose a "proportionate sanction" lacks merit. This is not a case in which Plaintiff claims he is innocent; he admits that he participated in a financial scheme and involved multiple teammates, conduct that ultimately led to police involvement. *See* Compl. ¶¶ 23–38, 40. There is no evidence of bad faith or arbitrary action. *See Coveney*, 388 Mass. at 20 (holding that "mere comparisons between punishments imposed on students are immaterial to the issue of whether a particular punishment imposed on a particular student is arbitrary or capricious"). The hearing board packet, including the police report, pictures, and flow charts, shows that Plaintiff's involvement exceeded that of other students. S*ee generally* **Exhibit B**, *Board Hearing Packet;* **Exhibit J**, *Police Report*. Hence, as noted in the Decision Letter, there was a reasonable basis for the University's determination that expulsion was the only appropriate outcome, given that the Conduct Board was presented with evidence that the Plaintiff targeted students with financial

vulnerabilities and younger students[1], instigated and facilitated each of the five circle scams, and attempted to coerce others not to report the stolen funds. *See* **Exhibit E**, *Decision Letter*, p. 4.  The Decision Letter also stated its belief that, without Plaintiff, none of the other students would have been involved in the scheme, and it further noted his lack of honesty, accountability, and remorse. *See id.* Moreover, the Bentley Student Handbook does not guarantee a specific outcome or proportionality review beyond the Conduct Board's discretion. *See Havlik*, 509 F.3d at 36 (holding that reasonable expectations are not violated where the school follows handbook procedures and acts in good faith).

## II.    Plaintiff's Opposition Does Not Establish Any Legally Cognizable Basis for a Breach of the Covenant of Good Faith and Fair Dealing Claim

Plaintiff has offered no valid grounds to refute this Court's clear holding in *Finnegan*, which confronted nearly identical facts and confirmed that no implied covenant can arise where the student handbook expressly disclaims the formation of a contract. *See Finnegan*, 2024 WL 4772299, at \*10. Significantly, the cases the Plaintiff cites all involved situations where an enforceable contract between the parties was undisputed. *See Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 80 (1st Cir. 2018)("The parties do not dispute that a contractual relationship between Doe and B.C. arises from the Student Guide and the Conduct Board Procedure"); *Doe v. Brandeis Univ.*, No. 20-CV-12162-AK, 2023 WL 1822785, at \*8 (D. Mass. Feb. 8, 2023) ("Brandeis does not dispute that its Student Handbook created a contract between itself and Doe");  *Doe*, 238 F. Supp. 3d at 215 ("At this stage in the litigation, the University has not argued the Student Handbook did not constitute a contract between itself and Doe").

---

[1] During one of the police interviews, a student reported that the Plaintiff specifically targeted certain freshmen. *See* **Exhibit J**, *Police Report,* p.14.

Moreover, as detailed above, Plaintiff cannot show that the University's adjudication lacked good faith. His arguments rely solely on vague, conclusory assertions that are contradicted by the very documents he references and relies upon in the Complaint. Accordingly, Plaintiff's claim of a breach of an implied covenant of good faith and fair dealing is subject to dismissal.

## III.    CONCLUSION

WHEREFORE, Defendant respectfully requests that this Honorable Court: (i) grant their Motion to Dismiss with prejudice; and (ii) grant such other and further relief as this Court deems just.

Respectfully submitted,

BENTLEY UNIVERSITY,

By its Attorneys,

*/s/ Gregory Manousos*
Gregory A. Manousos (BBO #631455)
Jennawe M. Hughes (BBO #698667)
**MORGAN, BROWN & JOY, LLP**
28 State Street, 16th Floor
Boston, MA  02109
(617) 523-6666
gmanousos@morganbrown.com
jhughes@morganbrown.com

Date: December 2, 2025

## **CERTIFICATE OF SERVICE**

I, Jennawe M. Hughes, hereby certify that on December 2, 2025, a copy of the foregoing document, filed through the ECF system, will be served on all parties as provided by the Notice of Electronic Filing (NEF).

*/s/ Jennawe M. Hughes*
Jennawe M. Hughes